IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BARRY L. MCMILLIAN                                                               PLAINTIFF

v.                                                              CAUSE NO: 1:22-CV-117-SA-RP

ABERDEEN SCHOOL DISTRICT                                        DEFENDANT

ORDER AND MEMORANDUM OPINION

On August 23, 2022, Barry McMillian initiated this civil action by filing his Complaint [1] against Aberdeen School District ("the District") alleging retaliation under Title VII and Section 1981 and two state law claims: discharge in violation of Mississippi's whistleblower statute and discharge in violation of public policy. Now before the Court is the District's Motion for Summary Judgment [36]. Having reviewed the parties' filings and the applicable authorities, the Court is prepared to rule.

*Factual Background*

Barry McMillian, a black man, began working for the District as a maintenance worker in 2014.[1] The maintenance department was supervised by Willie Brandon, the Chief Operations Officer. Although McMillian was supervised by Brandon, he often received his work assignments from the facilities manager, Clarence Lee.

Brandon and McMillian had ongoing tension dating back to 2018. McMillian contends that, in August 2018, Brandon verbally reprimanded him for working overtime. McMillian contends that he reported this incident to then-superintendent, Jeff Clay. According to McMillian, as a punishment, Brandon changed his shift time from 6:00 AM to 3:00 PM to 7:30 AM to 4:30

---

[1] This was McMillian's second stint of employment with the District. He returned to the District in August 2009 as a part-time maintenance worker. He transitioned to a full-time maintenance employee in 2014 where he remained until his termination in 2021.

PM so that McMillian had to work later. No other worker experienced a change in their shift time. This shift change lasted approximately three or four months.

In May 2019, McMillian, along with his attorney, attended a school board meeting to report another grievance against Brandon. Specifically, McMillian complained that Brandon made him wash school buses, which was, according to McMillian, outside the scope of his job duties. In January 2021, there was an overtime issue based upon Brandon's contention that McMillian improperly failed to clock out for lunch. At the end of January 2021, McMillian's attorney wrote a letter to the District about Brandon harassing McMillian and continuing to make him perform duties outside the scope of his job. McMillian then attended another board meeting to express his grievances.

Following the board meeting, McMillian spoke with Charles Beene, the then-principal of Aberdeen High School. Beene instructed McMillian to file an EEOC charge. After filing three grievances with the District, on March 10, 2021, McMillian filed his first EEOC Charge alleging race discrimination for having to perform duties outside of his job description that his white coworkers did not have to perform.[2]

At some point in March 2021, although it is unclear whether it was before or after McMillian filed his EEOC Charge, Clay instructed McMillian to report directly to him instead of Brandon, apparently in hopes to ease some of the tension. This lasted from March 2021 through June 2021. According to McMillian, at the end of June, Brandon confronted him and instructed

---

[2] For context, the parties provide conflicting dates as to when McMillian's EEOC Charge was filed. In its supporting Memorandum [37], the District references the EEOC Charge as being filed on May 16, 2021. Conversely, McMillian's own documents provide conflicting dates. His Complaint [1] provides an execution date of March 10, 2021, while his Response Memorandum [42] states March 16, 2021 as being the date the Charge was filed. However, in his deposition, McMillian testified that he filed his EEOC Charge on March 10, 2021. Considering that the District has not disputed that date, the Court will proceed on the basis that the Charge was filed on March 10, 2021—the date to which McMillian testified under oath.

McMillian to resume reporting directly to him. In turn, the tension between McMillian and Brandon apparently resumed. On July 23, 2021, McMillian submitted a complaint to the Mississippi Office of the State Auditor via e-mail reporting that Brandon was running his personal funeral home business during school hours. McMillian contends he did not tell anyone other than Lee that he filed a complaint.[3] According to Clay, neither he nor Brandon were aware that McMillian was the one who made the complaint to the State Auditor until this lawsuit commenced—which was one year later.

On Friday, August 6, 2021, McMillian contends that he worked until lunch and then left early because he had already worked 43 hours that week, which caused him to have overtime.[4] He contends that the maintenance workers followed an unwritten policy that if they worked over 40 hours per week during a particular week, they could take an extended lunch or leave early on Friday to avoid overtime. McMillian contends that he informed Lee that since he had stayed late on Tuesday, he was not going to return to work after lunch. Clay testified that, this same day, he saw McMillian mowing a yard off campus during school hours. Although there is some dispute about whether McMillian was actually mowing a lawn off campus, McMillian nonetheless admits that he was not at work during the time Clay observed him off campus.

---

[3] The Court notes that there is conflicting testimony about whether McMillian told Lee of his intent to submit a complaint to the Auditor's office before or after actually filing his complaint. McMillian testified that he told Lee about his complaint around August 4, 2021. He testified that on that day he saw a funeral gurney in the school bus shop and then told Lee that "since [Brandon] was acting like this toward me I was going to send it to the state auditor's office." [41], Ex. 3 at p. 62. If this conversation indeed occurred on August 4, 2021, then it contradicts McMillian's own deposition testimony that he submitted his complaint to the Auditor on July 23, 2021.

[4] The Court notes that in Clay's unsworn statement, he contends that on August 6, 2021 "[McMillian] signed out at 11:45 am and did not sign back in until 2:45 pm." [36], Ex. 9. However, in his deposition, Clay testified that McMillian never returned to work after lunch.

On August 10, 2021, a State Auditor investigator came to the Central Office for the District to investigate McMillian's complaint.[5] On August 11, 2021, Clay contends he spoke with McMillian about his failure to return to work on August 6, 2021, at which time McMillian informed Clay that he left work early because he had already worked 43 hours that week and he had previously been told that he was not allowed to work more than 40 hours per week. Clay then spoke with Brandon via e-mail. Brandon informed Clay that leaving work to refrain from working more than 40 hours was *not* the general practice and McMillian did not notify Brandon that he would not be returning to work after lunch. This same day (August 11, 2021), McMillian was suspended from work for not returning to work on August 6, 2021. Two days later, on August 13, 2021, Clay mailed McMillian a termination letter stating that his termination would go into effect on August 16, 2021.

After his termination, on September 9, 2021, McMillian filed his second EEOC Charge alleging retaliation. In his Complaint [1], McMillian alleges retaliation in violation of Title VII and Section 1981. He also alleges two state law claims: discharge in violation of Mississippi's whistleblower statute and discharge in violation of public policy.[6] The District now seeks dismissal of all of McMillian's claims.

---

[5] It is somewhat unclear to the Court what day the State Auditor investigation took place. At one point, McMillian alleges in his Complaint [1] that the *investigation* took place on August 10, 2021. Conversely, in his Response Memorandum [42], McMillian contends that he was *suspended* on August 10, 2021—indicating that the investigation must have taken place August 9, 2021 (assuming that he was in fact suspended the day after the investigation). The Court notes that the date the investigation took place is crucial since McMillian argues he was suspended the day *after* the investigation occurred and he was sent a termination letter two days after his suspension. The termination letter that McMillian received was dated August 13, 2021. Although noting this discrepancy, for purposes of this Motion [37], the Court accepts the August 10, 2021 date as the day the investigation occurred and August 11, 2021 as the date the suspension occurred.

[6] In his Response Memorandum [42], McMillian concedes his claim for discharge in violation of public policy. To the extent the present Motion [36] seeks dismissal of that claim, it is GRANTED. That claim is accordingly DISMISSED *with prejudice*.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted above, McMillian alleges claims for retaliation in violation of Title VII and Section 1981 and a state law claim in violation of Mississippi's whistleblower statute. The Court

will address each claim in turn.

I.     Retaliation Claims

McMillian asserts retaliation claims under Title VII and Section 1981.[7] Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Hudson v. Lincare, Inc.*, 58 F.4th 222, 231 (5th Cir. 2023).

As the plaintiff, McMillian has the burden to show a prima facie case of retaliation. "To establish a prima facie case of retaliation, [the plaintiff] must show that: 1) [he] engaged in a protected activity; 2) [he] suffered an adverse employment action; and 3) there is a causal connection between the two." *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) (citing *Saketoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022)). "If a plaintiff succeeds in making a prima facie case, the burden then shifts to the defendant to proffer a legitimate rationale for the underlying employment actions. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (citing *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001)).

A. Prima Facie Case

The parties do not dispute that McMillian engaged in a protected activity when he filed his first EEOC Charge on March 10, 2021. It is also undisputed that McMillian suffered an adverse employment action when he was terminated on August 16, 2021. However, the parties disagree as to the third element—that is, whether there is a causal connection between McMillian filing his first EEOC Charge and being terminated from the District.

---

[7] The Fifth Circuit has held that "retaliation claims under §1981 and Title VII…are parallel causes of action, which means they require [] proof of the same elements in order to establish liability*." Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019). The Court will therefore analyze the Title VII and Section 1981 claims together.

6

The District contends that McMillian's termination had nothing to do with his EEOC Charge but, rather, that McMillian was fired because he was mowing grass off campus when he was supposed to be at work and did not notify his supervisor that he would not be returning to work.

For his part, McMillian makes two arguments to establish a causal connection. First, he argues that he has shown close enough timing between filing his EEOC Charge and his termination (approximately five months). Second, he contends that he has provided evidence that the District maintained a policy that allowed employees to leave early or take an extended lunch to avoid overtime if they worked over 40 hours during a particular week. Consequently, he contends that the fact that he was not at work on the afternoon of Friday, August 6, 2021, is not the real reason for his termination.

"Close timing between an employee's protected activity and an adverse action against [him] *may* provide the 'causal connection' required to make out a prima facie case of retaliation." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)) (emphasis in original). "Such temporal proximity must generally be 'very close.'" *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001)). "[A] five-month time lapse is not close enough, without other evidence of retaliation, to establish the 'causal connection' element of a prima facie case of retaliation." *Lyons*, 964 F.3d at 305.

As the Supreme Court recognized in *McDonnell Douglas*, "the facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell*

7

*Douglas*, 411 U.S. at 802 n. 13, 93 S. Ct. 1817. The *McDonnell Douglas* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L.Ed.2d 957 (1978).

Recognizing that the *McDonnell Douglas* framework was never intended to be applied in a rigid fashion, the Court feels it more appropriate to address McMillian's argument as to the unwritten policy at length at the pretext stage. Thus, for summary judgment purposes, the Court finds that McMillian has established a prima facie case of retaliation.

*B. Legitimate, Non-Retaliatory Reason*

The burden now shifts to the District to show that it had a legitimate, non-retaliatory reason for terminating McMillian. The District contends that McMillian was terminated because Clay observed McMillian mowing a lawn off campus when he was supposed to be at work. The Court finds this reason sufficient for summary judgment purposes.

*C. Pretext*

Because the District has provided a legitimate, non-retaliatory reason for termination, the burden shifts back to McMillian to demonstrate that the District's proffered reason for terminating him was pretext for retaliation.

As noted above, the District contends that McMillian was terminated because he did not return to work after lunch on August 6, 2021. However, McMillian argues that, on that particular date, he had already worked 43 hours for the week, and he acted in accordance with the unwritten policy, which permitted him to leave early or take an extended lunch to avoid overtime. Thus, according to McMillian, the District's reason is pretextual.

First, McMillian points to Lee's testimony, wherein he testifies that the maintenance workers were allowed to leave early once they reached 40 hours for the week:

8

> Q. That's fair enough. That's all we want is what you can testify to as you sit here today. When you -- do you ever worktime for the school district?
>
> A. Some, but very little. It was very little.
>
> Q. Did they –
>
> A. They frown on overtime.
>
> . . .
>
> Q. And if you knew on Thursday that you were – if you worked your regular shift on Friday you would end up working overtime, what would you do about it?
>
> A. You just leave whenever your 40 hours is up.
>
> Q. Just leave whenever 40? Would you take longer lunches or leave –
>
> A. It was either take longer lunch or just leave early.
>
> Q. Did that ever change during the time you were working there?
>
> A. Not that I know of.
>
> . . .
>
> Q. Mr. Lee, I have one questions [sic]. If you were to leave early for lunch – take a long lunch, I'm sorry, or leave early on Friday, did you let somebody know you were leaving campus?
>
> A. Normally not. Sometimes, depending on what was going on I would. But most of the time if I was going to leave early I would tell [McMillian], look, I'm going to be gone for a little while, take care of the business and I'll be back.

[41], Ex. 1 at p. 8, 9, 10, 13.

McMillian also relies on Brandon's testimony to support his argument on this point:

9

> Q. If somebody is approaching 40 hours going into Friday where they'll definitely end up working overtime, how do you avoid not -- the employee not working overtime?
>
> A. Prior to COVID, I think employees just took long lunches or left early on that Friday. During the COVID stint, there was a concern with multiple employees taking advantage of that system to where they would work 40 hours on Thursday and take the whole day off Friday.
>
> Q. Work 40 hours on a 24-hour day?
>
> A. No.
>
> Q. Or you mean 40 hours up through Thursday?
>
> A. Yeah, up through Thursday.
>
> Q. And then take Friday off.
>
> A. Take the whole day Friday off. Or they would work 35 hours, come to work Friday and work five hours and take off Friday. So that practice kind of shifted after COVID.
>
> Q. Do you have any documentation that shows how the policy shifted after COVID?
>
> A. It wasn't a policy.
>
> Q. So what was it?
>
> A. It was a procedure.
>
> Q. Just procedure? But any documentation that shows that that procedure shifted – changed after COVID?
>
> A. Not really anything documented. Just leadership meetings about people leaving and taking advantage of that practice. When there was work to be done on Friday, no one was at work.

[41], Ex. 4 at p. 16-17.

Although not binding, the Court finds noteworthy a decision from the District Court for the Northern District of Texas, wherein that court dismissed the plaintiff's retaliation claim on the

10

basis that there was no causal connection between the plaintiff's protected activity and his termination. *Siddiqui v. AutoZone W., Inc.*, 731 F. Supp. 2d 639, 659 (N.D. Tex. 2010). There, Marsoor Siddiqui was employed at AutoZone as a store manager beginning in 1998. *Id.* at 643. According to Siddiqui, after the September 11, 2001 terrorist attacks, he "became the subject of racial epithets" and other verbal abuse. *Id.* In 2008, Siddiqui complained to a Regional Training Manager of the unfair treatment he was receiving from his District Manager and his Regional Manager. *Id.* In May 2008, an employee informed the District Manager that Siddiqui "had removed a part from the store without paying for it, and had installed it in his car." *Id.* According to the District Manager, Siddiqui purchased the part after being confronted. *Id.* Following an investigation, AutoZone terminated Siddiqui's employment under its Zero Tolerance policy for employee theft. *Id.* Siddiqui contended that AutoZone maintained an informal policy that employees were allowed "to take parts from stores and pay for them later." *Id.* at 643-44. Siddiqui alleged claims of harassment, race discrimination, and retaliation against AutoZone. *Id.*

For his retaliation claim, Siddiqui alleged AutoZone terminated him for complaining about unfair treatment and not because of the Zero Tolerance policy. *Id.* at 660. He further contended that there was a genuine issue of material fact that an unwritten policy existed and that AutoZone terminated him for doing what the policy permitted. *Id.* at 652. Therefore, according to Siddiqui, AutoZone's reliance on its Zero Tolerance policy was pretextual. *Id.* To support his theory as to the existence of the policy, Siddiqui relied on his own testimony that AutoZone had an informal standard practice among its stores that allowed employees to install parts from the store and pay for them later. *Id.* The court ultimately dismissed Siddiqui's retaliation claim because he had not provided evidence that the informal standard practice applied to *store managers*. *Id.* at 654. Therefore, Siddiqui had not provided sufficient evidence that would allow a jury to find that his

11

termination was the result of him complaining about unfair treatment and not his violation of the Zero Tolerance policy. *Id.* at 660.

Although somewhat factually similar, the present case is distinguishable from *Siddiqui*. Aside from his own testimony, McMillian has provided testimony from Lee (another maintenance employee) as well as Brandon (McMillian's direct supervisor) that the District not only disapproved of overtime but also had an unwritten policy that allowed employees to leave early or take an extended lunch to avoid overtime. Importantly, the Court also notes that Clay testified that the District frowned upon hourly employees receiving overtime. All of this evidence weighs in McMillian's favor.

The District additionally argues that McMillian has not offered any evidence that he was not required to notify his supervisor that he would not be returning to work. Although McMillian testified that he did inform Lee that he would be leaving, the Court also finds it relevant to note that Lee testified that the maintenance workers normally did not notify anyone if they were going to take an extended lunch or leave early. This testimony cuts against the District's arguments on this point.

Notably, the Supreme Court has held that "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000). Additionally, the District Court for the Southern District of Mississippi has held that "certainly an employer's deviation from its written or unwritten policies and practices may raise an inference of pretext." *Martin v. Waring Invs., Inc.*, 2008 WL 2312728, at *4 (S.D. Miss. May 30, 2008) (citing *Machinick v. PB Power, Inc.*, 398 F.3d 345, 354-55 (5th Cir. 2005)).

Against this backdrop, the Court finds that there is competent summary judgment evidence in the record that the District's reason for terminating McMillian was pretextual. Again, McMillian does not dispute that he was not at work during the time Clay allegedly observed him off campus. He alleged that he left work, consistent with the District's unwritten policy, because he had already worked more than 40 hours that week. In the Court's view, McMillian has, at a minimum, offered sufficient evidence to create a question of fact as to whether there was an unwritten policy permitting him to leave work. The evidence that this unwritten policy existed casts doubt on the District's explanation that McMillian was terminated for conduct that would have been specifically permitted under the policy.

Considering the evidence of retaliation in favor of McMillian, coupled with the fact that McMillian's termination occurred five months after filing his EEOC Charge, the Court finds that questions of fact remain as to whether the District's termination of McMillian's employment was retaliatory. A reasonable jury could infer that McMillian was terminated in retaliation of his filing of an EEOC Charge. Therefore, the District's request for dismissal of McMillian's retaliation claims is denied.

## II.    State Law Whistleblower Claim

McMillian also asserts a claim under Mississippi's whistleblower statute, MISS. CODE ANN. § 25-9-173. Specifically, McMillian argues that he was terminated because he filed a report with the State Auditor's Office about Brandon allegedly operating his personal business during the time he was supposed to be working at the school. The Mississippi whistleblower statute provides, in pertinent part, that "no agency shall dismiss or otherwise adversely affect the compensation or employment status of any public employee because the public employee provided information to a state investigative body whether or not the testimony or information is provided under oath."

13

MISS. CODE. ANN. § 25-9-173(1). The statute defines a "whistleblower" as:

> an employee who in *good faith* reports an alleged improper governmental action to a state investigative body, initiating an investigation…the term whistleblower also means an employee who in good faith provided information to a state investigative body, or an employee who is *believed* to have reported alleged improper governmental action to a state investigative body or to have provided information to a state investigative body but who, in fact, has not reported such action or provided such information.

MISS. CODE. ANN. § 25-9-171(j) (emphasis added).

The District makes two arguments as to why McMillian's whistleblower claim fails. First, the District argues that McMillian does not fit the definition of a whistleblower because he did not file his report in good faith. Second, the District argues that, in the event the Court finds that McMillian does fit the definition, his report to the Auditor was not the but-for cause of his termination.

Turning to the first argument, the District contends that McMillian did not file his report to the State Auditor in good faith. Instead, he did it "[t]o harass [Brandon] because he was not pleased with his work assignments or work hours, not out of any founded or good faith concern for the district." [37] at p. 7. As McMillian points out, the statute only requires that an employee *believes* illegal activity had occurred. *See* MISS. CODE ANN. § 25-9-171(j). In this instance, McMillian provided sworn testimony that he saw a funeral gurney located in the bus shop which led him to *believe* that Brandon was operating his personal business while he was on the clock for the District. Whether McMillian reported his belief in good faith is a question for the jury. The District's argument on this point is rejected.

Next, the District argues that McMillian's complaint to the Auditor was not the cause of his termination. As stated above, the District contends that McMillian was terminated because Clay observed him mowing a lawn off campus during school hours. The District also argues that

14

McMillian's complaint could not have been the reason for his termination because neither Clay nor Brandon knew that McMillian was the one who made the complaint until after this lawsuit commenced.

McMillian argues that because of the close timing between the investigation and his termination it is reasonable for a jury to infer that he was terminated because of his complaint to the Auditor. He does not dispute that Clay and Brandon were not *directly* aware that he was the one who filed the complaint and that Clay alone made the decision to terminate him; however, McMillian argues that a jury could infer that Clay believed McMillian was the one who made the complaint because he was the only employee who had animosity toward Brandon.

To support his contention that the close timing between the State Auditor investigation and his termination (a period of only a few days) creates a question of fact, McMillian relies on *Sherman v. Itawamba Cmty. Coll.*, 2023 WL 5020576 (N.D. Miss. 2023). There, Tatiana Sherman began working for Itawamba Community College ("ICC") in 2003 and held several different positions over the course of her employment. *Id.* at *1. In 2015, Sherman began reporting fraud, misappropriation of funds, and other wrongdoings pertaining to ICC's workforce training logs. *Id.* Throughout the following years, Sherman made several complaints of her findings to Joe Lowder, the Dean of the Department of Workforce Development, and Tzer Waters, the Workforce Project Director. *Id.* In March 2019, Sherman was placed on a Performance Improvement Plan because she was underperforming in her position. *Id.* Sherman contended that these assertions were untrue. *Id.* The following September, Sherman and her attorney sent a letter to Jay Allen, the president of ICC and other ICC administrative staff outlining the illegal conduct taking place at ICC. *Id.* Sherman also copied the State Auditor on the letter. *Id.* The State Auditor investigator conducted a raid on February 4, 2021. *Id.* Lowder was indicted in November 2021 for fraud. *Id.* Three months

15

after the raid, Allen terminated Sherman. *Id.* ICC contended that Sherman's termination was a result of her work performance. *Id.* However, Sherman argued that she was terminated because she provided information to the State Auditor, thus her termination was in violation of Mississippi's whistleblower statute. *Id.* at *2.

This Court held that Sherman's detailed report to the State Auditor alleging illegal acts, Lowder's indictment following the raid, Sherman's termination shortly after the raid, and evidence that her performance was not lacking, constituted competent summary judgment evidence sufficient to create a question of fact as to whether Sherman was terminated for providing information to the State Auditor. *Id.* at *7.

The District contends that McMillian's reliance on *Sherman* is misplaced. Specifically, the District argues that the evidence here shows that neither Brandon nor Clay were directly aware that it was McMillian who made the report to the State Auditor until after he filed his lawsuit. Further, the District emphasizes that the State Auditor's investigation resulted in no findings of any illegal activity.

Here, like Sherman, McMillian was terminated following an investigation from the State Auditor after he reported what he allegedly believed to be illegal activity. Similar to Sherman, McMillian has provided evidence contradicting the District's proffered reason for terminating him. Although the District contends that McMillian was terminated because he did not return to work after his lunch break on August 6, 2021, McMillian has offered evidence that he had exceeded 40 hours and there was a policy in place that allowed him to leave to avoid overtime. Stated simply, McMillian has provided a plausible explanation that he did nothing other than act in accordance with the policy on that date. Moreover, although the District notes that the investigation did not

result in findings of illegal conduct, the statute only requires that the employee believe that illegal activity was occurring.

Additionally, the District contends that Clay and Brandon were unaware that McMillian was the one who filed a complaint with the State Auditor and Brandon was not responsible for terminating McMillian.[8] Although it may be true that they were not *directly* aware, there is competent summary judgment evidence to support the contention that Clay was aware that McMillian and Brandon had longstanding tension. Clay testified that he instructed McMillian to report directly to him "to try to hopefully ease some tensions" between McMillian and Brandon. [41], Ex. 6 at p. 6. Furthermore, the District pointed to no evidence of any other employee having any issues with Brandon. Thus, the Court finds that a jury could infer that Clay believed it was McMillian who filed the complaint with the State Auditor.

The Court ultimately finds that a reasonable jury *could* conclude that Clay terminated McMillian because he believed McMillian had filed the complaint with the State Auditor. In other words, questions of fact remain as to whether McMillian was terminated for whistleblowing. To the extent the District seeks dismissal of McMillian's whistleblower claim, it is denied.

---

[8] The Court notes that McMillian argues that Clay and Brandon were working together to terminate him. Whether Clay and Brandon were working together to terminate McMillian is a question for the jury. *See Simmons v. Pac. Bells, L.L.C.*, 787 F. App'x 837, 843 (5th Cir. 2019) (finding that a jury could infer that the regional manager, who made the decision to terminate plaintiff, was aware of issues between the plaintiff and the general manager. Thus, plaintiff's termination may have been pretextual).

*Conclusion*

For reasons set forth above, the District's Motion for Summary Judgment [36] is GRANTED IN PART and DENIED IN PART. McMillian will be permitted to proceed to trial on his retaliation and whistleblower claims. As noted above, McMillian's state law claim for wrongful termination in violation of public policy is DISMISSED *with prejudice*.

SO ORDERED, this the 5th day of January, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE